J-A19013-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: E.P., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: R.B., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 444 WDA 2025 |

Appeal from the Order Dated March 13, 2025
In the Court of Common Pleas of Allegheny County
Orphans' Court at No. CP-02-AP-0000090-2024

BEFORE:  BOWES, J., STABILE, J., and BENDER, P.J.E.

MEMORANDUM BY BENDER, P.J.E.:                **FILED: September 19, 2025**

R.B. (Mother) appeals from the order which granted the petition of the Allegheny County Office of Children, Youth & Families (CYF) and terminated her parental rights to E.P. (Child).[1]  We affirm.

FACTUAL AND PROCEDURAL HISTORY

Child was born in December 2016.  She has autism spectrum disorder and "is nonverbal, very minimal verbal."  N.T. at 5.  CYF became involved with the family due to Mother's "use and abuse of drugs, and how [Mother's drug use] affect[ed her] parenting."  **Id.** at 154.  In August 2023, CYF received multiple referrals concerning Mother's drug use and her failure to supervise Child; CYF also learned that Mother and Child had been in a serious car

_____

[1] The court also terminated the parental rights of J.P. (Father), who "ultimately withdrew his opposition to the termination of his parental rights."  Orphans' Court Opinion (OCO), 4/29/25, at 1 n.2; **see also** N.T., 3/7/25, at 7-9.

accident. *Id.* at 40. CYF obtained custody of Child on September 6, 2023. *Id.* at 39.

Child was adjudicated dependent on October 10, 2023. The juvenile court ordered Mother to "participate in a drug and alcohol evaluation and follow treatment recommendations, attend random urine screens, work with crisis in-home, and then permit CYF to enter her home." *Id.* at 43. The court further ordered that Child be placed "into a home that had working knowledge of [Child's] disability and could manage … all of her services." *Id.* That same day, CYF placed Child with R.C. and T.C. (Foster Parents), where Child has continued to reside. *Id.* at 46.

The juvenile court held regular review hearings and repeatedly found that Mother failed to participate in court-ordered services. On September 27, 2024, CYF petitioned to terminate Mother's parental rights. The orphans' court appointed counsel to represent Child and scheduled a termination hearing for March 7, 2025.[2] CYF presented testimony from three witnesses: CYF caseworker, Rhianna Diana; CYF permanency caseworker, Rick Ogden; and Auberle foster care director, Susan Rosati. Mother testified in opposition to termination.

---

[2] The orphans' court determined that Child's counsel could represent Child's legal and best interests. Child's counsel explained that Child is "unable to state a position," and the court confirmed its finding that counsel could fulfill "both roles." *See* N.T. at 5, 164; *see also In re Adoption of K.M.G.*, 240 A.3d 1218, 1224 (Pa. 2020) (explaining that counsel may represent a child's legal and best interests when the interests do not conflict).

*Ms. Diana*

The CYF caseworker, Ms. Diana, testified that she became involved with the family in August 2023.  ***Id.*** at 37.  She explained that Mother had tested positive for cocaine prior to the car accident, and refused a blood test when the accident occurred.  ***Id.*** at 92-93.  Ms. Diana expressed "concerns as to [Mother's] parenting and her appropriate supervision [of Child, and] concerns for drug and alcohol abuse as well." ***Id.*** at 40.  The parties stipulated that the juvenile court "actually ordered CYF to assume custody" of Child.  ***Id.*** at 39.

Ms. Diana confirmed that Child had resided with Foster Parents since October 10, 2023.  ***Id.*** at 46.  Throughout Child's placement, Mother was ordered to participate in services to address her sobriety, mental health, domestic violence/inter-partner violence, housing, and parenting.  ***Id.*** at 48. Ms. Diana stated that "it has been hard to get ahold of [Mother]." ***Id.*** at 47. She explained:

> I did keep in contact with Mo[ther initially], letting her know that … I was removing [Child], [and] letting her know where [Child] was going.  And then contact was sporadic as she didn't want to talk to me.  Most times, [Mother] didn't want to listen to what I had to say.  [Mother c]ontinued to say, talk to my attorney, [and I] would communicate … through e-mail with [Mother's attorney,] because she didn't want to talk to me.

***Id.*** at 76.

Ms. Diana testified that it was difficult to reach Mother by phone, and Mother would periodically "call from unknown numbers … saying that her phone wasn't working." ***Id.*** at 76-77.  Ms. Diana stated, "throughout the

length of the case, [Mother's] number was not working, or she would call me from numbers and say she was going to get in touch and reach [me] by mail and she did not." *Id.* at 78. Ms. Diana also observed that Mother failed to appear at a majority of the review hearings. *Id.* at 79-80. She described "the theme throughout" as Mother saying "she has been confused." *Id.* at 80.

Regarding services, Ms. Diana testified that Mother was ordered to participate in a psychological evaluation on September 19, 2024, but did not appear. *Id.* at 94-95. Also in 2024, Mother completed only 2 of 12 classes to address inter-partner violence. *Id.* at 95-96. Ms. Diana relayed that Mother admitted to using cocaine. *Id.* at 48. She stated that Mother appeared for three drug screens from January through March 2024, and "was positive for all three." *Id.* at 84. Ms. Diana noted the "last screen [Mother] took for us was March 25, 2024, and she was positive for cocaine." *Id.* According to Ms. Diana, Mother said she could not "go to inpatient [drug treatment] because she needed to work." *Id.* at 85. However, in October 2024, Mother called Ms. Diana to advise that she was in rehab. *Id.* at 89, 98. Shortly after, Mother was released from rehab, but "was arrested and incarcerated" from November 2024 to March 2025. *Id.* at 53. Ms. Diana stated her understanding that Mother "was just released from the county jail approximately, maybe two days ago." *Id.* She explained that CYF did not pursue video visits with Child during Mother's incarceration, as Child was "an eight-year-old, nonverbal child with a bunch of other special needs," and CYF

"did not think [Child] would even look [at, or] come to the camera because she does not sit still very often." *Id.* at 61. Ms. Diana emphasized Child's "need for structure, her need for routine and her inattentiveness." *Id.* at 91.

Ms. Diana testified that Child had not seen Mother since her removal from Mother's care in August 2023. *Id.* at 73. Ms. Diana specified that Mother had no contact with Child in the six months prior to CYF filing the termination petition on September 27, 2024. *Id.* at 69. She repeated that communicating with Mother was a challenge "throughout the life of this case." *Id.* at 59. Ms. Diana stated, "[I]t's hard to make referrals when we don't have active [phone] numbers and can't engage a client." *Id.* at 96.

With respect to termination, Ms. Diana said she did "not believe terminating [Mother's] parental rights would … have an effect on [Child]." *Id.* at 73. To the contrary, she expressed concern about Child being removed from Foster Parents. Ms. Diana testified that Child's "necessary and beneficial relationship is with" Foster Parents. *Id.* She explained:

> I honestly am very touched by [Child's] progress. I have not seen as much progress in my almost 14 years, as much progress that a child has made in care than what [Foster Parents] have done to help [Child]. …
>
> [Foster Parents are] who I've observed [Child] to have a primary attachment to…. [Child] looks to them to meet her needs. She looks [to] them … for comfort. They have been able to get all of her services and some extra ones that I don't even know if anybody [else] would have thought of.
>
> [S]o removing [Child] from [Foster Parents] would be detrimental because [Child] would not have that [kind of placement for Child elsewhere].

*Id.* at 74.

*Mr. Ogden*

The CYF permanency caseworker, Mr. Ogden, testified that he and two other caseworkers were assigned to visit Child at her pre-adoptive placement with Foster Parents. *Id.* at 103-04. He opined that Foster Parents met all of Child's educational, psychological and developmental needs, and remarked, "[t]here's a lot, but they do it." *Id.* at 105. Mr. Ogden observed that Foster Parents "really seem to get" Child, who is "able to communicate with them [about] her wants and needs." *Id.* He added that Child is "always clean, well taken care of[, and is] reported to be doing [well] in school." *Id.*

*Ms. Rosati*

The Auberle foster care director, Ms. Rosati, testified that she was also Child's foster caseworker. *Id.* at 14. She confirmed that Child has lived with Foster Parents, in pre-adoptive placement, since October 10, 2023. *Id.* at 14, 16. Ms. Rosati stated that Child has "routine preventative medical and dental care. She does [physical therapy], [occupational therapy], and speech therapies. She sees neurology. She is seen by genetics, and she is seen by psychiatry." *Id.* at 17. Ms. Rosati described Child as "very sweet" and "gentle and kind and just very unique." *Id.* at 21.

Like Ms. Diana, Ms. Rosati expressed her belief that removing Child from Foster Parents would be "detrimental for [Child's] wellbeing." *Id.* at 23. Ms. Rosati relayed, "whenever I am there[, Child] wants to make sure that she stays close to" Foster Parents. *Id.* She stated that Child "will go to them or

sit near them. She is a touchy-type child. She loves to be able to grab onto their hand or their arm." ***Id.*** at 31. Ms. Rosati opined that Foster Parents "have done wonderfully with adjusting to [Child's] needs." ***Id.*** at 30.

*Mother*

Mother testified that she was released from jail the day before the termination hearing, and was residing at a transitional facility "in the work release program." ***Id.*** at 110. She confirmed that she was incarcerated from November 2024 through March 2025, and was on probation at the time of the hearing. ***Id.*** at 111, 113.

Mother testified that she tried to maintain contact with CYF and Ms. Diana. She stated:

> I … tried to ask about [Child]. I would never [hear] anything. No nothing. It was very bland [*sic*]. [T]hey could have gotten ahold of me. They knew my mum's – I mean it was sporadic at the time. They took [Child]. I was going through a lot. …
>
> [Ms. Diana] always knew … I told her always that she could call my mother. She blatantly told me that – she, actually, said to me the one day, what is wrong with your mother, she called me three times and asked me the same question. …
>
> There was a lot going on, … it was a terrible time. Everybody [was] fighting and it was all because of this.

***Id.*** at 122-23. Mother added, "I wish I would have got [into] their programs…. I've asked for help. I did. You could tell in my voice, like I needed it. I wanted it." ***Id.*** at 124. She also stated, "I have never gotten invited to anything. I've never gotten any service plans. I've never even got anything." ***Id.*** at 138. Mother did not recall taking any classes for inter-partner violence,

although Ms. Diana testified that Mother completed 2 of 12 classes. *Id.* at 133-34. Mother explained that she had been in "a deep depression." *Id.* at 135, 149. She also explained that she used cocaine "to keep me going," and would "take [opiates and] anything that would put me down." *Id.* at 148-49. Mother admitted to ongoing drug use, and emphasized that addiction is a disease. *Id.* at 137. She testified that her "clean date" was October 7, 2024. *Id.* at 128.

Mother repeatedly expressed her love for Child and opposition to termination. *Id.* at 129-30. She stated that prior to CYF's involvement, "everything was fine" and Child "was doing so good." *Id.* at 130. She also said she "was doing everything [she] possibly could." *Id.* In contrast, Child's counsel expressed the view that CYF had met its burden for termination.[3] *Id.* at 167. Counsel noted that Child had no contact with Mother "in more than a year," and argued that the orphans' court "shouldn't seek to maintain a legal relationship that doesn't exist." *Id.* at 165-66. Counsel recommended that Child "have the ability to obtain safe, stable permanency through adoption." *Id.* at 164.

At the conclusion of the hearing, the orphans' court advised that it would "continue the hearing briefly, to have the opportunity to review everything and consider" the decision. *Id.* at 169. When the court re-convened, it stated that it was granting the petition to terminate Mother's parental rights. *Id.*

---

[3] Child's counsel observed that Child's "best and legal interests [are] indistinguishable." *Id.* at 164.

On March 13, 2025, the court entered an order terminating Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (a)(2), (a)(8), and (b). Mother filed a timely notice of appeal, along with a concise statement of errors pursuant to Pa.R.A.P. 1925(a)(2)(i).

Mother presents the following questions for review:

1. Whether the trial court abused its discretion and/or erred as a matter of law by finding that CYF met its burden of proof by clear and convincing evidence[, and] thereby granting the petition to involuntarily terminate Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1)?

2. Whether the trial court abused its discretion and/or erred as a matter of law by finding that CYF met its burden of proof by clear and convincing evidence[, and] thereby granting the petition to involuntarily terminate Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(2)?

3. Whether the trial court abused its discretion and/or erred as a matter of law by finding that CYF met its burden of proof by clear and convincing evidence[, and] thereby granting the petition to involuntarily terminate Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(8)?

4. Whether the trial court abused its discretion and/or erred as a matter of law in finding that CYF met its burden of proof by clear and convincing evidence that termination of Mother's parental rights would best serve the needs and welfare of the minor Child pursuant to 23 Pa.C.S. § 2511(b)?

Mother's Brief at 7-8.

## DISCUSSION

In considering the termination of parental rights, appellate review is limited to whether the decision is supported by the evidence. *In re Adoption of C.M.*, 255 A.3d 343, 358 (Pa. 2021). This Court must accept the orphans' court's findings of fact and credibility determinations if they are supported by

the record. ***Interest of S.K.L.R.***, 256 A.3d 1108, 1123 (Pa. 2021). Where the factual findings are supported by the evidence, an appellate court may not disturb the ruling unless it has discerned an error of law or abuse of discretion. ***In re Adoption of L.A.K.***, 265 A.3d 580, 591 (Pa. 2021). We may reverse for an abuse of discretion "only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." ***Id.*** (citations omitted). This Court will not re-weigh evidence, and we may not reverse a decision "merely because the record could support a different result." ***In re Adoption of K.M.G.***, 219 A.3d 662, 670 (Pa. Super. 2019) (*en banc*). Our Supreme Court has explained:

> Because trial courts are on the front lines assessing the credibility of witnesses and weighing competing and often challenging evidence, it is paramount that, in reviewing trial courts' decisions in this arena, appellate courts defer to trial courts' first-hand observations as they relate to factual determinations. In this regard, we reiterate that appellate courts must review such decisions for an abuse of discretion or error of law, and appellate courts may reverse trial courts only when that discretion has been breached or when the law has been misapplied. In other words, an appellate court should review the certified record to decide whether it supports the trial court's order, regardless of whether the appellate court agrees with the result that the trial court reached.

***Interest of S.K.L.R.***, 256 A.3d at 1129. "Even if an appellate court would have made a different conclusion based upon the cold record, we are not in a position to reweigh the evidence and the credibility determinations of the trial court." ***Id.*** at 1122.

Termination of parental rights is governed by Pennsylvania's Adoption Act. *See* 23 Pa.C.S. § 2511. A court must first consider the parent's conduct and the enumerated grounds for termination in Section 2511(a). If the court finds clear and convincing grounds for termination under Section 2511(a), it must then assess the child's needs and welfare under Section 2511(b), "giving primary consideration to the developmental, physical and emotional needs and welfare of the child." *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). This Court "need only agree with [the] decision as to any one subsection of [Section 2511(a), in addition to Section 2511(b),] to affirm the termination of parental rights." *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

*Section 2511(a) Grounds for Termination*

We consider the orphans' court's finding of grounds for termination under Section 2511(a)(8), which provides for termination when:

> The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

23 Pa.C.S. § 2511(a)(8).

Under Section 2511(a)(8), a party must establish: (1) that the child has been removed from the care of the parent for at least twelve months; (2) that the conditions which led to the removal or placement of the child still exist; and (3) that termination of parental rights best serves the needs and welfare

of the child.[4] ***Matter of Adoption of L.C.J.W.***, 311 A.3d 41, 49 (Pa. Super. 2024). Section 2511(a)(8) does not require the court to evaluate a parent's willingness or ability to remedy the conditions that led to the child's placement. ***Id.***

Mother does not dispute that Child was removed from her care for more than 12 months. Mother's Brief at 40. However, she argues, "as to [Section 2511](a)(8), the record did not support the court's findings that Mother was not addressing her addiction at the time the petition was filed, that she was not remedying her parenting incapacity or that termination best met the needs and welfare of Child." ***Id.*** at 28. Mother emphasizes her testimony that at the time of the termination hearing, "she had maintained sobriety for 5 months, was in a recovery program, and, had participated and organized NA meetings while incarcerated." ***Id.*** at 41. Mother asserts that she "credibly testified [about] her efforts to see [Child] and to get the help she desperately needed[, which] amounted to running into a 'brick wall,'" and that she "did everything she could to remedy the communication issue" with CYF. ***Id.*** at

---

[4] This Court has explained:

> Section 2511(a)(8) explicitly requires an evaluation of the "needs and welfare of the child" prior to proceeding to Section 2511(b), which focuses on the "developmental, physical and emotional needs and welfare of the child." Thus, the analysis under Section 2511(a)(8) accounts for the needs of the child in addition to the behavior of the parent.

***In re C.L.G.***, 956 A.2d 999, 1008–09 (Pa. Super. 2008).

42. Regarding Child's best interests, Mother states, "[p]rior to [Child's] removal, Mother demonstrated she was also a strong advocate for [Child] and her special needs[,] and was capable of ensuring [Child] had services and supports in place." *Id.* at 43-44. Mother maintains the "impact of termination on [Child] was not fully explored beyond statements related to Mother not having contact with [Child] and claims of Child doing very well with the foster family." *Id.* at 43.

The record supports the orphans' court's findings to the contrary. At the conclusion of the termination hearing, Child's counsel stated, "[W]ith [Section 2511(a)(8)], the conditions leading to [Child's] removal, I think continued to exist at the time of the filing of the petition. We heard testimony that [Mother's] clean date isn't until October [2024], which is after the filing of the [termination] petition." *Id.* at 165. CYF filed the petition to terminate Mother's parental rights on September 27, 2024. On direct examination, Mother's counsel asked Mother:

Q. In terms of your active addiction, can you tell the [court] what your clean date is?

A. October 7th[, 2024]. But I went in before that in September [2024].[5]

*Id.* at 128.

---

[5] Mother explained that she entered rehab in September, but "had to leave because [Father] was there as well. One of us had to go. … [T]hey said as long as he was almost done with the program, I could come back. So I left for about two weeks, and then I put myself back in." *Id.* at 113-14.

The orphans' court addressed Mother before announcing its ruling. The court stated:

> [Mother], first of all, [the termination hearing] was actually the first time that I've heard from you at any length. I think I may have seen you at least once before. And I want you to know that your love for [Child] absolutely stands out. …
>
> None of us, I think, wanted things to play out the way they have.

*Id.* at 169. However, the court found that CYF had "proven the grounds that they needed to prove by clear and convincing evidence." *Id.*

With respect to the first element of Section 2511(a)(8), the orphans' court recognized that Child had been removed from Mother's care for more than twelve months. The court noted that Child had been "in placement the entire time from September 6th of 2023," and "the 12-month requirement was met." *Id.* at 172.

As to the second element, the orphans' court found that the conditions which led to Child's removal continued to exist. The court explained:

> [T]he main ones, in my view, were concerns related to substance abuse and concerns related to parenting. So those were the reasons that [Child] was removed from [Mother's] care. …
>
> As [Mother testified, she was] in active use of substances, including cocaine and opiates, through much of 2024. …
>
> The date [Mother entered treatment] was October 7th of 2024. That was after the termination petition was filed and after [Mother was] aware that it had been filed. So it is very clear to me that that condition, [and] the concerns regarding [Mother's] substance abuse, continued to exist at the time the termination petition was filed.

*Id.* at 172-73. As to parenting concerns, the court found "because [Mother] did not have contact or visitation with [Child], it is not possible for me to conclude that those conditions had been remedied." *Id.* at 174.

Finally, in advance of discussing the third element pertaining to Child's needs and welfare, the orphans' court said it "want[ed] to say a few words about credibility." *Id.* at 176. The court stated that it "found Ms. Diana's testimony credible regarding opportunities for [Mother] to meet with Ms. Diana." *Id.* The court added:

> I also want to say this. I do not believe that CYF was the barrier to visits occurring [between Mother and Child]. … I know [Mother] does not share that perspective. But there was extensive testimony about the difficulty that CYF had in communicating with [Mother] and that is something that was [Mother's] responsibility to fix.

*Id.* at 177. The court also credited Ms. Diana's testimony in finding that termination served Child's needs and welfare. The court explained:

> Regarding [Child's] needs and welfare, as we all know, this is a child with extensive special needs. That was true while she was in [Mother's] care. That's true now. [Child] needs structure. She needs routine. She needs consistent attention and focus.
>
> She has had that from the time that she was placed with [F]oster [P]arents[,] from them. That's over a year of the type of intense, focused, supportive parenting that [Child] needs. And she is thriving.

*Id.* at 179.

In finding that termination best served Child's needs and welfare, the orphans' court emphasized Child's extensive special needs, lack of contact with Mother, and the fact that Child was "thriving" with Foster Parents. **See**

- 15 -

*id.*; *see also* OCO at 6-7.  As the record supports the court's finding of grounds for termination under Section 2511(a)(8), we discern no error or abuse of discretion.  Accordingly, we consider Child's needs and welfare under Section 2511(b).

*Section 2511(b) Needs and Welfare*

Section 2511(b) requires that the orphans' court "give primary consideration to the developmental, physical and emotional needs and welfare of the child."  23 Pa.C.S. § 2511(b).  Intangibles "such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child."  *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005) (citation omitted).  The court must consider the parent-child bond and effect on the child of permanently severing the bond.  *Id.*  The court "must also consider whether the child[ is] in a pre-adoptive home and whether [the child has] a bond with their foster parents."  *In re T.S.M.*, 71 A.3d at 268.

Mother argues that the orphans' court erred in finding termination served Child's needs and welfare.  Mother claims the court "leaned heavily on the testimony of the caseworker that Child was thriving under the care of [Foster Parents, but] failed to engage in any meaningful evaluation of the bond between Mother and Child and the impact of severance of same on Child."  Mother's Brief at 29.  This argument is not persuasive.

First, Mother failed to identify this argument in her concise statement.  With respect to Child's needs and welfare, Mother claimed:

> The [orphans'] court abused its discretion and/or erred as a matter of law in finding that CYF met its burden of proof by clear and convincing evidence that termination of Mother's parental rights would best serve the needs and welfare of the minor Child pursuant to [23 ]Pa.C.S. §2511(b). The record does not support such a conclusion. The trial court is precluded from making a finding under [§]2511(b)[,] as CYF failed to meet its burden of proof under §2511(a).

Concise Statement of Errors Complained of on Appeal, 4/11/25, at 2.

An issue is waived when an appellant fails to identify it with "specificity in [the Rule 1925 concise] statement of errors complained of on appeal." **Balicki v. Balicki**, 4 A.3d 654, 661 (Pa. Super. 2010). In **Balicki**, we found waiver where the appellant did not identify an issue in his concise statement and the trial court did not address it in its opinion. **Id.** Here, we likewise find waiver because Mother did not raise the issue of her bond with Child in her concise statement, and the orphans' court did not address it in its opinion.

Waiver notwithstanding, we note that the orphans' court's analysis of Child's bond with Mother was hindered by Mother's failure to pursue visits with Child and appear for the court-ordered psychological evaluation.[6] N.T. at 95. When CYF introduced the evaluation into evidence, it observed that the evaluation was "simply an interactional between [C]hild and [F]oster [P]arents." **Id.** at 100.

---

[6] Ms. Diana testified that Mother was notified of the evaluation. She explained that CYF's permanency department makes the referral for the evaluation, uses "the KIDS system, and they would have had [the] address [of Mother's mother], as well as two [others]." **Id.** at 95. Ms. Diana also testified to speaking with the psychologist's secretary about mailing notice to Mother. **Id.**

We would also recognize our Supreme Court's holding that orphans' courts "have the discretion to place appropriate weight on each factor present in the record before making a decision regarding termination that best serves the child's specific needs." *Int. of K.T.*, 296 A.3d 1085, 1113 (Pa. 2023) (footnote omitted).  In particular:

> The Section 2511(b) inquiry must also include consideration of other important factors such as: the child's need for permanency and length of time in foster care consistent with 42 Pa.C.S. § 6351(f)(9) and [the federal Adoption and Safe Families Act], 42 U.S.C. §§ 675(5)(C), (E); whether the child is in a pre-adoptive home and bonded with foster parents; and whether the foster home meets the child's developmental, physical, and emotional needs, including intangible needs of love, comfort, security, safety, and stability.  These factors and others properly guide the court's analysis of the child's welfare and all her developmental, physical, and emotional needs.  *See T.S.M.*, 71 A.3d at 268–69 ("[T]he law regarding termination of parental rights should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved.").

*Id.*

As discussed above, Child's counsel noted that Child had no contact with Mother "in more than a year," and argued that the orphans' court "shouldn't seek to maintain a legal relationship that doesn't exist."  N.T. at 165-66.  Consistent with this argument, the court explained:

> It was particularly notable to me that Ms. Diana, who is a very experienced caseworker and has been employed by [CYF] for years, observed that the improvement in [C]hild's functioning is something that she's not sure she's seen before, the way in which [C]hild has improved in the care of [F]oster [P]arents.
>
> I have no difficulty believing, as Ms. Diana testified, that [C]hild's current primary attachment is to [F]oster [P]arents, that she

would regress if she were removed from them, and that it would be a great detriment to her if she were removed from them.

These are small things, but for a child who isn't verbal, I thought they really stood out. There was an example given … of [Child] trying to put her foster father's mouth into a smile when he was looking unhappy or frowning a little bit.

There was another example … of [Child] unzipping her foster father's coat. He was supposed to leave, and [C]hild was supposed to stay.

What clearer communication could there have been to say, I want you to stay here, you're not going?

And there was other testimony … that was very meaningful to me regarding [Child,] who can't tell us what she is thinking and feeling.

I did review [the psychologist's] evaluation, which is fully consistent with the testimony that I just highlighted. [The psychologist] could not have been more complimentary about the parenting that [Child] is receiving.

In contrast, because [Child] has been thriving in the ways that I described without any kind of contact with [Mother], I do conclude that whatever remainder of a relationship she has with [Mother] is not necessary to her wellbeing.

*Id.* at 179-81.

In the absence of waiver, we would conclude that the orphans' court did not err or abuse its discretion in considering Child's needs and welfare. For the above reasons, we affirm the order granting CYF's petition and terminating Mother's parental rights.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

9/19/2025